IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 22-cv-01873-GPG-KAS

JACOB KNIGHT, JACK CRIBBS, and JASON DOHSE,
individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

WATA, INC. and
COLLECTORS UNIVERSE, INC.,

    Defendants.

## ORDER

Before the Court are Defendants' Motion For Summary Judgment (D. 122) and Plaintiffs' Motion[s] for Class Certification Pursuant to Federal Rule Of Civil Procedure 23(b)(3) (D. 123; 124).[1] The Court GRANTS IN PART and DENIES IN PART the summary judgment motion and DENIES the motions class certification for the following reasons.

---

[1] Plaintiffs filed the same motion twice, apparently because the appendix attached to the first motion is empty (D. 123-1).

1

## I. UNDISPUTED MATERIAL FACTS[2]

**A. Defendants' Business**

Launching in 2018, Defendant Wata, Inc. (Wata) was a Colorado start-up company that experienced growth and had to scale up to address the increased demand (D. 122 at ¶ 16).[3] As of July 1, 2021, Wata was purchased and operated by Defendant Collectors Universe Inc. (CU), which is headquartered in California (D. 122 at ¶ 2, D. 129 at ¶ 28).

Wata sells grading and encapsulation services to the public (D. 122 at ¶ 1; D. 129 at ¶ 27). The civil action arises from Defendant Wata's alleged inability to timely provide grading and encapsulation services for retro video games. This service is similar to (but not exactly like) art provenance or comic book authentication, except with vintage or older video games. Plaintiffs allege that they would pay for timely turnaround based on speed tier estimates and that Defendants routinely failed to provide their grading and encapsulation services based on those advertised time frame estimates.

Wata's goods and services are offered to the public exclusively through Wata's website at watagames.com and when placing an online order, customers are presented with a screen that required them to select a service tier (D. 129 at ¶ 29). Service tier levels corresponded to the estimated turnaround time for a game (D. 129 at ¶ 30). The other components of Wata's pricing consisted of other services offered under the same turnaround tiers, including additional percentage charges based on the value of the game submitted with a more valuable game costing more to

---

[2] The Court draws the operative facts as set forth from Defendants' Statement of Undisputed Facts (D. 122 at 4–8) and Plaintiffs' Statement of Additional Disputed Facts (D. 129 at 5–13). The Court finds the following facts undisputed for the purposes of deciding the motions. The facts are identified by paragraph number.

[3] Plaintiffs purport to dispute this fact but do not directly dispute the asserted fact. Accordingly, this fact is deemed admitted.

grade and encapsulate (D. 129 at ¶ 31).[4]  Games with a higher market value generally garner a larger fee as the grading fee is related to the market value with a higher fee for a higher-value product.

### B. Defendants' Backlogs

On July 1, 2019, Wata made a post to Facebook stating in part: "Important announcement, delayed turnarounds . . . we are currently experiencing long-than-expected turnarounds on select tier submissions" (D. 129 at ¶ 37).  Wata admits that it is not reasonable to believe customers had an obligation to go look at Wata's Facebook page to determine the status of their orders (D. 129 at ¶ 39).

On July 18, 2019, Wata made a post to Facebook linking to a newsletter and buried within that newsletter, the following statement appeared: "We want to remind our submitters that due to the high volume of submissions in the last months, we are currently experiencing long-than-expected turnarounds, primarily on select submissions" (D. 129 at ¶ 40). There were no changes made to the turnaround times stated on the website and Wata did not send direct e-mails to customers with open orders (*id*.).

On September 6, 2019, Wata made a post to Facebook which stated, in part: "Hello everyone, this is Deniz Kahn.  Things are cranking up here at Wata and we have a backlog of games to grade and send out" (D. 129 at ¶ 41).  Wata admits that at this time, there was a large backlog of games and customers were frustrated with delays and a lack of responses to inquiries

---

[4] Defendants purport to dispute this fact but do not directly dispute the asserted fact.  Accordingly, this fact is deemed admitted.

(*id*.). Wata uses the term "backlog" to describe orders that remain uncompleted past their estimated turnaround time (*id*.).

On September 6, 2019, Wata made a post to Facebook which stated, in part: "I see a lot of concern with delays, we are working out best to address all of your concerns" (D. 129 at ¶ 42).

On September 10, 2019, Wata made a post to Facebook which acknowledged the company had an ongoing backlog under the Select tier that could take months to clear but was continuing to accept orders (D. 129 at ¶ 43). This was at least the fourth acknowledgment of a backlog, yet Wata still failed to make changes to its service tiers and continued to state the same turnaround times (*id*.).

On or about October 9, 2019, Wata, sent out an e-mail blast to its mailing list which stated that Select service tier was being paused and Speed-Run and Warp-Zone submission "will be accepted as submitted but may not process and ship with the respective standard turnaround times" (D. 129 at ¶ 44). This was the fifth public acknowledgment of a backlog, yet Wata did not change the turnaround times stated on its website (*id*.).

On October 30, 2019, Wata sent an e-mail blast, posted a link to Facebook and posted to its website another statement about a "backlog" and raising prices (D. 129 at ¶ 45).

On December 1, 2019, Wata made changes to the turnaround times stated on the website (D. 129 at ¶ 46).

All the aforementioned backlogs and delays occurred before the COVID pandemic began in March of 2020 (D. 129 at ¶ 47). Evidence indicates that, as of late 2019, there were still only two graders at Wata, the same number there were since the beginning of the company (D. 129-1 at 17, 35).

### C. Defendants' Changes

In 2020 and 2021, Wata experienced significant business interruptions due to the COVID-19 pandemic, including shipping and supplier delays (D. 122 at ¶ 17).[5] Wata doubled its team; worked extra hours; refined its grading, encapsulation, and shipping processes to return games quicker; and paid air freight shipping rates that doubled part-related costs to receive supplies faster (D. 122 at ¶ 21).

On or about May 1, 2020, in an e-mail blast and on its website, Wata referenced the pandemic and stated, in part: "As of now, we don't expect delays at the WarpZone or Select service levels" (D. 129 at ¶ 48).

On July 22, 2020, Wata, still being behind on virtually all orders across all service tiers, sent out an e-mail blast which stated, in part: "[W]e may not be able to honor the guaranteed/posted turnaround times during this transition. Turnarounds will be completed based on priority as orders will continue to be processed and completed respective to their submission tier" (D. 129 at ¶ 49). Wata, Inc. failed to change the service tiers offered on its website (*id.*).

On or about October 1, 2020, Wata changed the turnaround times by extending the time for fulfillment (D. 129 at ¶ 51).

On or about April 15, 2021, Wata, Inc. posted the following statement to Facebook: "First, we want to apologize to all of our customers for the struggles you may have been facing with turnarounds and communication. [W]e are still behind on most of the available tiers, most notable being the Turbo tier" (D. 129 at ¶ 52).

---

[5] Plaintiffs purport to dispute this fact but do not directly dispute the asserted fact. Accordingly, this fact is deemed admitted.

On or about May 1, 2021, Wata, Inc. updated their website to state, in part: "Due to the high volume of orders that we've been receiving, we are temporarily changing our service tiers and estimated turnaround times, effective immediately" (D. 129 at ¶ 53).

### D. Plaintiffs' Purchases

Plaintiff Jacob Knight, a California resident, purchased grading and encapsulation services for three games from Wata on June 8, 2020, and chose the Select service tier when he made his purchase which had a turnaround time of 180 days (D. 122 at ¶ 4; D. 129 at ¶ 34). Knight paid Wata $117.00 dollars to receive his games graded, cleaned, encapsulated and returned within 180 days (D. 129 at ¶ 34). Knight did not receive his games back until March 6, 2022, which is 636 days after he placed his order (*id*.). Knight never saw Wata's Facebook posts or website changes that discussed backlogs or delays (*id*.)

Plaintiff Jack Cribbs, a Michigan resident, placed his order for two games on April 7, 2021, and selected the SpeedRun service tier, which called for a turnaround time of fifteen (15) business days, or April 28, 2021, and paid $85 per game for the order, or $170, for grading and encapsulation services. (D. 122 at ¶ 5; D. 129 at ¶ 35). Cribbs games were not returned until November 6, 2021 (D. 129 at ¶ 35). Cribbs purchased an elevated service tier in order to have his games returned quickly in the advertised turnaround time of 15 days (*id*.). Cribbs did not see any of Wata's Facebook posts (*id*.). Cribbs believed that he was contracting for service within the 15 business days stated by Wata during the transaction (*id*.) Cribbs understood the reference of an "estimate" to be related to potential shipping delays from third party carriers, not from Wata's grading and encapsulation services (*id*.) Cribbs understood that by confirming his purchase through the Wata website, he was entering into a contractual relationship wherein Wata would

6

grade, encapsulate and return his games to him within 15 business days, with a few days leeway for shipping (*id.*).

Plaintiff Jason Dohse, a resident of Iowa, placed his order for five games on December 4, 2021, and selected the "Speed Run" level service which had an estimated turnaround time of forty-five (45) business days and paid $85 per game for five games ($425 total) to be graded and encapsulated (D. 122 at ¶ 6; D. 129 at ¶ 36). Plaintiff Dohse purchased Wata's grading services for the express purpose of reselling the games—not for personal, household, or family purposes (D. 122 at ¶ 7).[6]  It was not until March 30, 2022, that Mr. Dohse was notified his games had been shipped back (D. 129 at ¶ 36).

Each Plaintiff checked the box on Wata's website agreeing to the terms and conditions of the Wata Services Agreement (Agreement) prior to submitting payment for grading and encapsulation services from Wata (D. 122 at ¶ 9). The Agreement also contains a choice-of-law, force majeure, and limitation of liability provisions (D. 122 at ¶ 12).  No Plaintiff entered into a written modification to the Agreement (D. 122 at ¶ 11).

## II.  PROCEDURAL HISTORY

This case was originally filed in the U.S. District Court for the U.S. District Court for the Central District of California, but was transferred to this District on July 27, 2022, due to language in the clickwrap Agreement:

> 8.2 Governing Law. This Agreement will be governed by the laws of the State of Colorado as applied to agreements made, entered into and performed entirely in Colorado by Colorado residents. All claims under, or otherwise with respect to, this Agreement will be brought and maintained in the State and Federal courts located in the City and County of Denver,

---

[6] Plaintiffs purport to dispute this fact but do not directly dispute the asserted fact.  Accordingly, this fact is deemed admitted.

> Colorado, and the parties hereby expressly consent to the exclusive venue and jurisdiction of such courts and waive any and all objections to such venue and jurisdiction, including with respect to forum non conveniens.

(D. 30 at 2).

Plaintiff raises eight claims regarding Defendants' alleged false statements and unfair business practices: (1) Unfair Competition Law (UCL), in violation of California Business & Professions Code §17200; (2) False Advertising (FAL), in violation of California Business & Professions Code §17500; (3) Intentional Misrepresentation; (4) Nondisclosure; (5) Consumers Legal Remedies Act (CLRA), in violation of California Civil Code § 1770; (6) Breach of Contract; (7) Breach of Duty of Good Faith and Fair Dealing; and (8) Colorado Consumer Protection Act, in violation of Colorado Revised Statute § 6-1-101, *et seq*. (D. 116). Defendants seek summary judgment on all claims (D. 122).

Plaintiffs seek class certification (D. 123). The proposed class was preliminarily defined as:

> . . . all individuals in the United States who directly purchased encapsulation and video game grading services from Wata, Inc. from May 10, 2019[,] who did not have their orders returned within the turnaround times estimated by Wata, Inc. on the company's website.

(D. 116 at 21).

### III. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the factual record and reasonable inferences based on said record "in the light most favorable to the non-moving party." *Utah Lighthouse Ministry v. Found. for*

8

*Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).  The moving party bears the burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  If the moving party meets this burden, the opposing party must go beyond the pleadings and designate evidence showing there is a genuine triable issue.  *Celotex*, 477 U.S. at 323–24.  Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial."  *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

A class action is a procedural mechanism that enables a federal court to adjudicate the claims of multiple parties at once.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).  Certification of the class is required for the class action to proceed. Federal Rule of Civil Procedure 23 contains a two-part inquiry that provides the class certification requirements governs the requirements for class certification.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  A district court may certify a class action if the proposed class satisfies the prerequisites of Fed. R. Civ. P. 23(a), as well as the requirements of one of the three types of classes identified in Rule 23(b). The district court must undertake a "rigorous analysis" to satisfy

9

itself that a putative class meets the applicable Rule 23 requirements. *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014) (quotations omitted).

Rule 23(a) sets four threshold requirements:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) also requires a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The party seeking to certify the class – here, the Plaintiffs – bears the burden of proving that each of the Rule 23 requirements have been met. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (quotations omitted).

## IV. ANALYSIS

### A. Defendants' Motion for Summary Judgment.

Defendants argue that Plaintiffs cannot prove their fraud claims because the evidence does not show fraudulent intent, that Defendants' estimated turnaround times were not contract terms, and that the California statutory claims fail because the statutes are inapplicable (D. 122 at 3–4).

*1. Sufficient Evidence Supports an Inference of Fraudulent Intent.*

Defendants argue that their estimated turnaround times are not actionable because they are mere estimates and there is no evidence that they made knowingly false statements (D. 122 at 10–11).  These arguments are not persuasive.

In order to prove fraud under Colorado law, Plaintiffs must show: 1) Defendant made a false representation of a past or present fact; 2) the fact was material; 3) at the time the representation was made, the defendant either knew the representation was false or was aware that he, she or they did not know whether the representation was true or false; 4) defendant made the representation with the intent that Plaintiff would rely on the representation; 5) plaintiff relied on the representation; 6) plaintiff's reliance was justified; and 7) damages.  Colo. Pattern Jury Instr. Civ. 19:1 (2023); *see also Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995); *Wisehart v. Zions Bancorporation*, 49 P.3d 1200, 1204 (Colo. App. 2002).[7]

Defendants' arguments that its stated turnaround times are not actionable merely because it labeled them "estimates" is not supported by relevant authority.  The Colorado Supreme Court has stated that the "mere expression of an opinion in the nature of a prophecy as to the happening or non-happening of a future event is not actionable." *Leece v. Griffin*, 150 Colo. 132, 135, 371 P.2d 264, 265 (1962).  Yet, Defendants' actions here are not analogous to prophecy about some separate event because they were fully in control of the circumstances and had the relevant information about past performance to estimate their expected performance.  Although Defendants

---

[7] The elements for fraudulent concealment are similar: "(1) concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages." *Kopeikin v. Merchants Mortg. & Tr. Corp.*, 679 P.2d 599, 601 (Colo. 1984).

were making estimates, those estimates were a present fact that should reflect past facts, namely, their ability to turn around orders in a certain period.   That is, customers could understand these estimates to reflect Defendants' past ability to turn around orders and their present ability to turn around new orders.  *See Russell v. First Am. Mortgage Co.*, 565 P.2d 972, 975 (Colo. App. 1977) ("[A] false representation of a past or present fact is any words or conduct which create[s] an untrue or misleading impression of the actual past or present fact in the mind of another.").  As provided, the stated turnaround times were only estimates in the sense that they provided a rough forecast instead of a specific guarantee; they could reasonably be understood to reflect past performance and present conditions.  To the extent that Defendants were falsely representing their present ability to process orders, which should be based on past performance, such statements are actionable.

Further, statements about future events are actionable "where evidence establishes that, at the time the promise as to future events was made, the promisor did not intend to perform the promised action."  *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994).  This brings us to Defendants second argument, asserting that there is no evidence "that Wata had no intention of meeting the estimated turnaround times for the specific service tier selected at the specific time that each individual Plaintiff made his purchase" (D. 122 at 10).  In support of this argument, Defendants rely almost exclusively on self-serving testimony that they intended to meet the estimates (*id*. at 11).  But a reasonable jury could reject such testimony in view of the substantial evidence showing that Defendants were aware of their substantial backlog that had led to extended turnaround times in the past; that the circumstances had existed for a substantial period of time and continued to exist; and, despite Defendants' knowledge of these circumstances,

12

Defendants continued state the same predicted turnaround estimates for an extended period. Such evidence supports a conclusion that Defendants had no intention of even roughly meeting their stated turnaround times when Plaintiffs made their purchases. Even within Defendants self-serving testimony, there is nothing to suggest that they had a roadmap to consistently meeting, even roughly, their stated turnaround times at any point before they began revising the estimates on their website. Indeed, Defendants' public statements indicate they were aware that the orders that they had in hand already would take significantly longer than the estimated processing time. Yet, at the same time, they continued to take on more orders using the same estimates that would be placed in line behind the already delayed orders. A jury need not blindly accept testimony that Defendants intended to do something contrary to their past experience and performance.

*2. Defendants are Not Entitled to Summary Judgment on Damages.*

Defendants also argue that Plaintiffs cannot show damages based on an expert report stating that damages based on the cost of services would not be an appropriate measure of damages (D. 122 at 15). Defendants cite no legal authority suggesting that the cost of services is inappropriate as a remedy (*id*.). Indeed, Colorado law is to the contrary, allowing recovery to the extent that the benefit conferred falls short of the value as misrepresented. *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994) (citing, e.g., Restatement (Second) of Torts § 549 (1977)). As Defendants note, Plaintiffs seek alternatives to the full cost of services as a measure of damages, such as the difference in price between service tiers reflective of slower service (*id*. at n.8). This request is consistent with Colorado law. Defendants' arguments that the full amount paid by customers may not be an appropriate remedy do not show that Plaintiffs cannot show damages as a matter of law. *See* Restatement (Second) of Torts § 549 (1977) ("Loss may result from a

13

recipient's reliance upon a fraudulent misrepresentation . . . when the falsity of the representation causes the article bought, sold or exchanged to be regarded as of greater or less value than that which it would be regarded as having if the truth were known.").[8]  Accordingly, the Court denies summary judgment on Plaintiffs' fraud claims

### 3. Contract Claims

Defendants argues that the estimated turnaround times are were not a term of the Agreement and that, even if they were, failing to meet such estimates would not be a material breach (D. 122 at 16–17).

Plaintiffs respond that the Agreement "does not contain identification of the specific games, the service tier customers paid for or any agreement to pay Wata for its services" and, therefore, the service terms (including presumably the turnaround estimates) must form specific terms of the contract (D. 129 at 18–19).  These arguments are not persuasive.

"Colorado law requires parties to agree on all essential terms to form a contract."  *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (citation omitted).  "Such terms 'must be sufficiently definite to enable the court to determine whether the contract has been performed or not.'"  *Id*. (quoting *Stice v. Peterson*, 144 Colo. 219, 355 P.2d 948, 952 (1960)).  But "Colorado law 'does not require precise terms related to payment to prove the formation of a valid contract.'"  *Parker v. Souki*, No. 22-CV-0165-WJM-MDB, 2023 WL 4237090, at *5 (D. Colo. June 23, 2023) (quoting *Bill Barrett*, 918 F.3d at 766).  Further, when the terms are not sufficiently precise to form a contract, a court does not read additional terms into

---

[8] Colorado has also recognized disgorgement as a remedy for fraud in appropriate circumstances.  *Page v. Clark*, 197 Colo. 306, 315, 592 P.2d 792, 798 (1979) (citing *Langworthy v. Republic Mutual Ins. Co.*, 103 Colo. 393, 86 P.2d 610 (1939)); *see also Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 153 F. Supp. 2d 1231, 1246 (D. Colo. 2001).

14

a contract, rather, it "cannot enforce it." *Bill Barrett*, 918 F.3d at 766 (quotation marks omitted). The Court cannot "inject substantive terms into the parties' contract." *Miller v. Bank of New York Mellon*, 2016 COA 95, ¶ 41, 379 P.3d 342, 348 (citations omitted); *see also Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) ("We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction.") (citation omitted).

The Agreement explicitly defines the "Services" to be rendered by Wata and, separately, defines the compensation to be paid by customers as "amounts displayed on your screen, including, without limitation, fees for the Services, insurance costs, and shipping and handling expenses" (D. 122-1 at 181–82). In doing so, the Agreement provides the essential terms for a contract by providing consideration for promises. The turnaround estimate is not among these terms. Accordingly, Plaintiffs' breach of contract claim and breach of duty of good faith and fair dealing claims[9] fail, and the Court dismisses them.

### 4. California Statutory Claims

Defendants raise separate arguments with respect to the individual Plaintiffs. With respect to Cribbs and Dohse, Defendants argue that they lack standing because they "are not California residents and have no proof any wrongful conduct took place in California" (D. 122 at 19). Defendants further argue that Doshe's claim fails because he bought the services for a business purpose (*id*. at 21). As Plaintiffs note, however, Defendants "ignores the obviously proper plaintiff Knight," who "is a California resident" (D. 129 at 21). In this context, the Court cannot find that

---

[9] Plaintiffs make no separate argument regarding their good faith and fair dealing claim (D. 129 at 18–19).

Plaintiffs are entitled to summary judgment on the California statutory claims, as they request.[10] The Court denies summary judgment on these claims.

### 5. *Injunctive Relief*

Defendants assert that Plaintiffs' request for injunctive relief should be dismissed because there is no evidence of ongoing or future harm (D. 122 at 22). Plaintiffs respond, without citing any evidence, that "Defendants continue to operate in the same manner as they did previously, simultaneously charging customers for turnaround times while also using the word 'estimate'" (D. 129 at 22). There are no facts in the summary judgment record, undisputed or otherwise, that support this contention (*id*. at 8–14). Thus, the Court will strike the request for injunctive relief.

### B. Plaintiffs' Class Certification Motions

Plaintiffs' motions for class certification warrant only summary treatment. Plaintiffs' argument on the numerosity issue is typical of the problems. After several pages of generic legal citations not tied to any specific facts or issues in the case, Plaintiffs conclude with this summary argument:

> All factors militate in favor of class certification. We have thousands of easily identifiable class members dispersed across the United States, all with limited value claims. The number of people in each Class is well-beyond the number that other courts have found viable for certification. This is a case involving a[n] online transaction wherein customers engaged with Defendants' webpage. The process of placing an order was procedurally the same for each class member. While class member identities and contact information are easily identifiable, it would be practically impossible to join each putative class member to the action individually due to the limited nature of claims, court costs and logistical considerations. This is

---

[10] Defendants do not request summary judgment on Cribbs' and Dohse's claims alone, even in reply (D. 132 at 13–15). In this context, their claims are better resolved by determining whether they are appropriate class members.

>precisely the type of case that warrants class action treatment. The proposed Classes satisfy the numerosity requirements.

(D. 199 at 14). Despite proposing three distinct classes, for two of the proposed classes Plaintiffs provide no ascertainable numbers of class members and cite no information from which that information could be derived,[11] even when looking beyond the argument section of their brief (*id.* at 7–8). Even though there is "no set formula to determine if the class is so numerous that it should be so certified," Plaintiffs must offer "some evidence of established, ascertainable numbers constituting the class." *Colorado Cross Disability Coalition v. Abercrombie & Fitch, Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014). This sort of fundamental oversight not only defeats class certification but also calls into question the adequacy of class representation, another factor the Court must consider. The Court denies the two motions and suggests that Plaintiffs' counsel consider their arguments, particularly considering Defendants' criticisms and the Court's ruling on summary judgment, before refiling.

---

[11] For the first "Nationwide Class" class, no number of class members is provided, but it could at least be roughly estimated by the Court if it were inclined to calculate the number from raw evidence. This estimate would be unduly rough; Plaintiffs calculated the percentage of late orders for only one month (June of 2020), and they provide no evidence (or argument) indicating that that month was typical. Yet, the summary judgment record indicates that Wata updated its shipping estimates twice later that same year and it is reasonable to expect that, initially, the backlog built up over time. Thus, context suggests that June 2020 is likely to be among the worst months, rather than a typical month. There is also no information about how many late orders are attributable to "California residents" as relevant to the second proposed subclass. Finally, June of 2020 falls outside the time frame for the third proposed subclass, which runs from July 1, 2021, through May 10, 2022. Given that June 2020 is the only month for which the Court has any information about percentages of late orders and Wata updated its estimates at least twice before the proposed period for this third class, assuming the much earlier numbers applied would be mere speculation. The Court appreciates that the volume of data is large, but there does not appear to be any reason that it cannot be analyzed to the extent necessary to ascertain, at least roughly, the number of members in each proposed class without relying on the Court extrapolating from a single month that the record (and Plaintiffs' argument) provides no reason to believe is typical.

## V.  CONCLUSION

Accordingly, Defendants' Motion For Summary Judgment (D. 122) is GRANTED IN PART and DENIED IN PART and Plaintiffs' Motion for Class Certification Pursuant to Federal Rule Of Civil Procedure 23(b)(3) (D. 123; 124) are DENIED without prejudice.  It is FURTHER ORDERED that Counts VI and VII are DISMISSED and Plaintiffs' requests for injunctive relief are STRICKEN.

DATED May 14, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge